******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* PAUL E. SYKES
## (AC 47359)

Cradle, C. J., and Alvord and Clark, Js.

*Syllabus*

The defendant appealed from the judgment of the trial court finding him in violation of probation and revoking his probation. He claimed, inter alia, that there was insufficient evidence that he violated a condition of his probation. *Held*:

The trial court did not err in denying the defendant's motion to suppress certain evidence seized by his probation officer and other members of the Office of Adult Probation during a search of his apartment, as the defendant failed to sustain his burden of proving that the exclusionary rule, which does not ordinarily apply in revocation of probation proceedings, was applicable under the circumstances of this case.

There was sufficient evidence to support the trial court's conclusion that the defendant possessed sexually explicit materials in violation of a condition of his probation.

There was sufficient evidence to support the trial court's conclusion that the defendant violated the condition of his probation requiring that he use only those computers that had been approved by his probation officer.

The trial court erred in determining that the defendant violated the condition of his probation requiring him to take polygraph examinations, as there was insufficient evidence that his refusal to take a different examination violated this condition and, accordingly, because this court could not conclude that the trial court's erroneous factual finding did not impact the sentence it imposed, the judgment was reversed with respect to the defendant's sentence and the case was remanded with direction to resentence the defendant.

Argued March 18—officially released May 27, 2025

*Procedural History*

Information charging the defendant with violation of probation, brought to the Superior Court in the judicial district of Fairfield, geographical area number two, where the court, *McShane, J.*, denied the defendant's motion to suppress; thereafter, the case was tried to the court, *McShane, J.*; judgment revoking the defendant's probation, from which the defendant appealed to this court. *Reversed in part*; *further proceedings*.

*Judie Lynn Marshall*, assigned counsel, for the appellant (defendant).

*Timothy F. Costello*, supervisory assistant state's attorney, with whom, on the brief, were *Joseph Corradino*, state's attorney, and *Tiffany M. Lockshier*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

CLARK, J. The defendant, Paul E. Sykes, appeals from the judgment of the trial court finding him in violation of, and revoking, his probation under General Statutes § 53a-32. On appeal, the defendant claims that (1) the court erred in denying his motion to suppress and (2) there was insufficient evidence that he violated his probation. We disagree with these claims. However, because we conclude that one of the three grounds on which the court found the defendant in violation of his probation was not supported by sufficient evidence, and because we cannot be confident that the court's erroneous factual finding in connection with that ground did not impact the sentence it imposed, we set aside the defendant's sentence and remand the matter for resentencing.[1]

The following facts, which the court reasonably could have found, and procedural history are relevant to this appeal. On February 14, 2007, the defendant pleaded guilty under the *Alford* doctrine[2] to two counts of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A), two counts of risk of injury to a child in violation of General Statutes § 53-21 (a)

---

[1] The defendant also claims on appeal that the court abused its discretion in revoking his probation and ordering him to serve the full unexecuted portion of his sentence. In light of our disposition, we do not reach the merits of this claim. See, e.g., *State* v. *Johnson*, 75 Conn. App. 643, 658, 817 A.2d 708 (2003).

[2] See *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

(2), and one count of possession of child sexual abuse material in the second degree in violation of General Statutes § 53a-196e. On April 13, 2007, the court, *Comerford, J.*, imposed a total effective sentence of twenty years of incarceration, execution suspended after twelve years, followed by thirty-five years of probation. In 2016, the defendant was released from incarceration and began serving his term of probation. The defendant subsequently pleaded guilty to violating the terms of his probation on December 10, 2018, and was sentenced by the court, *Devlin, J.*, to eight years of incarceration, execution fully suspended, with 390 months of probation.

On February 19, 2019, the defendant signed conditions of probation as well as a computer access agreement, which he was required to sign as a component of those conditions. The defendant's conditions of probation and computer access agreement required, inter alia, that he possess no weapons, ammunition, or weapon components; submit to a search of his person, possessions, vehicle, or residence when a probation officer had reasonable suspicion to conduct such a search; attend sex offender treatment; take polygraph examinations administered by a Court Support Services Division approved, specially trained polygraph examiner for treatment purposes and level of supervision; neither possess nor subscribe to any sexually explicit or sexually stimulating material deemed inappropriate by a probation officer; use only the computers that he was authorized to use by his probation officer; consent to having his computer examined and/or searched at any time to verify compliance with the terms of his probation; agree to have software installed to monitor his computer use; provide probation with a list of all equipment used in conjunction with his authorized computer(s), including backup systems and disks; and not possess any sexually explicit or sexually stimulating

material in a disk, computer hard drive, or any other electronic storage medium. The computer access agreement further provided that the defendant was "responsible for all material and all information on [his] computer, on any computer [he has] been authorized to use by [his] [p]robation [o]fficer, and for the contents of any electronic storage medium under [his] control." The computer access agreement defined "computer" as "any device capable of accessing the Internet and/or any web-based applications, including any cell phones, smart TVs, tablets, mP3 players, USB plug in devices, gaming systems, etc." The defendant was approved to have three electronic devices in his residence, all of which were monitored by the Office of Adult Probation.

The defendant began weekly sex offender treatment at The Connection Center for the Treatment of Problem Sexual Behavior (The Connection). The defendant's probation officer, Julian Betancourt, received weekly updates from The Connection on the defendant's progress in treatment. At some point, The Connection informed Betancourt that the defendant had refused to take an "EyeDetect" examination, which The Connection was using in lieu of a polygraph examination in light of the public health concerns posed by the COVID-19 pandemic. The Connection issued the defendant a warning regarding his refusal to engage in the EyeDetect examination. Betancourt spoke to the defendant about his refusal, and the defendant admitted to Betancourt that he had refused the EyeDetect examination, stating that he had done so because he did not want the company that owned the examination to have his information. The defendant further stated that he would be willing to take a polygraph examination.

In March, 2021, Betancourt learned from the monitoring software installed on the defendant's devices that the defendant had observed two images on his phone pertaining to the assembly of homemade firearms.

Betancourt subsequently met with his supervisor in the Office of Adult Probation and, during that meeting, it was decided that a search of the defendant's apartment in Bridgeport would be conducted. On May 13, 2021, during an appointment with the defendant, Betancourt told him that he would be searching his apartment and presented him with a voluntary agreement to search form that specified the places to be searched as the defendant's apartment and vehicle. The defendant signed the form in the presence of Betancourt and another probation officer. The form instructed the person filling it out to check one of two boxes, indicating either that (1) the probation officer had explained to the probationer that if he did not agree to the search, the search would not occur and his refusal to the search would not be in violation of his conditions of probation, or (2) the probation officer had explained to the probationer that if he did not agree to the search, the search would not occur but his refusal might violate a condition of his probation. Neither box on the form that the defendant signed was checked.

That same day, Betancourt, accompanied by four other members of the Office of Adult Probation, two officers from the state police, and between one and five officers from the Bridgeport Police Department, conducted a search of the defendant's apartment and vehicle. The defendant waited in a car outside his residence with a probation officer while the search was conducted. No weapons, machines to make weapons, or weapon materials were recovered in the course of the search. The search of the defendant's residence did, however, yield approximately thirty-five electronic devices, including laptops, hard drives, and cell phones—a quantity well in excess of the three devices that the defendant was authorized to possess. The seized items were transported to the state police forensic laboratory (laboratory) for analysis.

Steven DiPietro, a computer forensic examiner with the laboratory, made copies of the hard drives and other media recovered from the search, and performed data extractions on the cell phones. DiPietro found, inter alia, that a laptop included among the seized devices contained 54 unique and 14 duplicate images of suspected child pornography; 344 unique and 34 duplicate images classified as "child exploitation/age indeterminate"; and 2 videos classified as "child exploitation/age indeterminate," which were located in a folder on the laptop's drive titled "UserssykespDesktopmlk convert." This folder was housed within a user created folder that was generated when someone with administrative rights on the laptop created a user account under the username "sykesp."

DiPietro transmitted the images of suspected child pornography to the National Center for Missing and Exploited Children, which identified twelve of them as depicting victims who had previously been identified by law enforcement as missing and exploited children. DiPietro's analysis also disclosed on certain of the seized devices various other still images and videos classified as "pornographic/sexually stimulating," as well as PDF files and still images pertaining to weapons and explosives. In addition, DiPietro discovered other materials on the seized devices, including receipts from Maine, where the defendant had resided for a period of time following his release from incarceration in 2016; medical documentation bearing the defendant's address; a file under the name "Monica Sykes"; and a copy of *United States* v. *Johnson*, 446 F.3d 272 (2d Cir.), cert. denied, 549 U.S. 953, 127 S. Ct. 425, 166 L. Ed. 2d 270 (2006), a case in which the United States Court of Appeals for the Second Circuit considered, inter alia, the propriety of requiring a person on federal supervised release to submit to polygraph testing.

Betancourt thereafter sought a warrant for the defendant's arrest. In the supporting affidavit accompanying the warrant application, Betancourt alleged that the defendant had violated the following conditions of his probation: "You will participate in polygraph examinations administered by a [Court Support Services Division] approved, specially trained polygraph examiner for treatment purposes and level of supervision"; "You will not possess, or subscribe to, any sexually explicit or sexually stimulating material deemed inappropriate by a [p]robation [o]fficer . . . [nor will you] patronize any adult book or adult video store, strip club, or adult entertainment club or similar establishment"; "I will notify my [p]robation [o]fficer in writing of any changes to the original written explanation for my use of the computer(s)"; "I will use only the computer(s) that I am authorized to use by my [p]robation [o]fficer"; "I will not access any site that contains sexually explicit or sexually stimulating material and any other site that my [p]robation [o]fficer has instructed me not to access"; and "I will not possess any sexually explicit or sexually stimulating material in any manner on disk, in computer hard drive, or any other electronic storage medium that can hold this type of material."

The defendant was arrested and charged with violation of probation under § 53a-32.[3] The court, *McShane, J.*, held a revocation of probation hearing over two days on November 16 and 17, 2023. On November 15, 2023, the eve of the hearing, the defendant filed a motion to suppress all items seized during the May 13, 2021 search pursuant to the first, fourth, fifth, and fourteenth amendments to the United States constitution, article first, §§ 7 and 8, of the Connecticut constitution, and

---

[3] Apart from the warrant application, the record does not reflect that the state filed a long form information or any other charging document that enumerated the specific conditions of probation that the defendant was alleged to have violated.

§ 53a-32. In his motion to suppress, the defendant argued that the Office of Adult Probation had lacked reasonable suspicion both that he was violating a condition of his probation and to search the thirty-five electronic devices seized from his apartment. The defendant further claimed that the Office of Adult Probation was "not only acting as an arm of the judiciary but also [as] law enforcement" when it seized those devices and submitted them to the laboratory for analysis. At the start of the hearing on November 16, 2023, the court stated that it would hear evidence pertaining both to the violation of probation and to the motion to suppress in the course of the adjudicatory phase of the hearing. The court then proceeded to take evidence. Betancourt and DiPietro testified on behalf of the state; the defendant did not testify and called no witnesses.

On November 17, 2023, following the presentation of evidence and oral argument by the parties, the court denied the motion to suppress in an oral ruling. The court found Betancourt's testimony to have been credible. It concluded that the Office of Adult Probation had reasonable suspicion to search the defendant's residence and vehicle, as well as the electronic devices recovered in the search, and noted that the defendant had agreed to the search. The court also concluded that the exclusionary rule did not apply, in any event, under the circumstances of the present case because the defendant had presented no evidence of "egregious, shocking or harassing police misconduct," and the record indicated that "there was no duress, no coercion, no trickery, no overbearing conduct on the part of probation in order to effectuate this search." The court further found that the Office of Adult Probation was "the one who instigated or started this search process," that Betancourt was "carrying out his responsibilities as a probation officer, not as a police officer" during the search process, and that the police "were [not]

involved to the point that they were the one[s] pushing or looking for the contents of these computer devices.”

The court then found that the defendant had violated his conditions of probation by (1) possessing sexually explicit materials, some of which involved children, (2) failing “to participate in the Office of Adult Probation order of polygraph and its equivalent, EyeDetect,” and (3) using computers that had not previously been approved by the Office of Adult Probation. The court revoked the defendant’s probation and imposed the full unexecuted portion of his sentence, i.e., eight years of incarceration.[4] The court based its dispositional determination on several factors, including the seriousness of the defendant’s original crimes of conviction, the similarity of the conduct underlying the instant violation to that for which he was originally charged, the fact that the defendant had previously been found to have violated his probation on the basis of what the court concluded was similar conduct,[5] and its conclusion that the defendant had been “researching” *United States* v. *Johnson*, supra, 446 F.3d 272, which the court surmised

_____

[4] The defendant was also charged in a separate information with one count of possession of child sexual abuse material in the first degree in violation of General Statutes § 53a-196d (a) (1). On May 23, 2024, following a jury trial, the defendant was convicted of that charge. *State* v. *Sykes*, Superior Court, judicial district of Fairfield, Docket No. CR-22-0346705-T. On August 1, 2024, the court, *Richards*, *J.*, sentenced the defendant to twenty years of incarceration. The defendant’s appeal from that conviction is currently pending before this court. See generally *State* v. *Sykes*, Connecticut Appellate Court, Docket No. 48055 (appeal filed September 25, 2024). Because the defendant’s appeal from that conviction remains pending, no portion of his challenge to the court’s finding in the present case that he violated his probation is moot. See, e.g., *State* v. *Milner*, 130 Conn. App. 19, 26, 21 A.3d 907 (2011), appeal dismissed, 309 Conn. 744, 72 A.3d 1068 (2013).

[5] In the affidavit supporting his application for a warrant to arrest the defendant in connection with this case, Betancourt stated that the defendant’s 2018 violation of probation was predicated on his having been terminated from sex offender treatment, engaging in an undisclosed sexual relationship with an individual who was also on probation, and using the Internet without permission.

was an attempt by the defendant to "[build] a defense" for his refusal to take an EyeDetect examination. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the trial court erred in denying his motion to suppress. Although he acknowledges that the exclusionary rule ordinarily does not apply in revocation of probation proceedings, the defendant argues that application of the exclusionary rule is warranted in the present case. He further argues that the court should have suppressed the fruits of the May 13, 2021 search because the search of his residence was not supported by reasonable suspicion, his consent to search was defective, in that he was not properly advised of the consequences of refusing consent, and the search was unreasonably expansive in scope. We conclude that the exclusionary rule does not apply in the present case, and we therefore reject the defendant's claim on that basis.

The following legal principles are relevant to our review of the defendant's claim. "[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's [ruling] . . . ." (Internal quotation marks omitted.) *State* v. *Jones*, 281 Conn. 613, 654, 916 A.2d 17, cert. denied, 522 U.S. 868, 128 S. Ct. 164, 169 L. Ed. 2d 112 (2007). It is similarly well established that, "[i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the

weight to be given specific testimony. . . . It is the privilege of the trial court to adopt whatever testimony it reasonably believes to be credible, and it is not the function of this court to retry the facts or pass on the credibility of a witness." (Citations omitted; internal quotation marks omitted.) *Hallock* v. *Hallock*, 228 Conn. App. 81, 104, 324 A.3d 193 (2024).

"[U]nlike criminal trials, in which the exclusionary rule typically applies, in probation revocation hearings, the exclusionary rule typically does not apply. . . . Thus, a probationer has the burden of persuading us that the exclusionary rule should nonetheless apply." (Citation omitted.) *State* v. *Jacobs*, 229 Conn. 385, 392, 641 A.2d 1351 (1994); see also *Payne* v. *Robinson*, 207 Conn. 565, 571, 541 A.2d 504 (explaining that "[t]he purpose of probation revocation proceedings is to determine whether a probationer is complying with the conditions of his probation" and that, "[i]n such proceedings, the government has an interest in accurate fact-finding that is likely to be impaired when otherwise reliable and relevant evidence is excluded"), cert. denied, 488 U.S. 898, 109 S. Ct. 242, 102 L. Ed. 2d 230 (1988). "Our bar on the application of the exclusionary rule to probation revocation proceedings is not absolute . . . as egregious, shocking or harassing police misconduct would warrant our application of the rule to such probation proceedings." (Internal quotation marks omitted.) *State* v. *Maietta*, 320 Conn. 678, 686–87, 134 A.3d 572 (2016).[6] This court previously has held the

---

[6] The state argues that this statement from *Maietta* is "nonbinding dictum" that is derived from stale precedent. We disagree. "Dictum includes those discussions that are merely passing commentary . . . those that go beyond the facts at issue . . . and those that are unnecessary to the holding in the case. . . . [I]t is not dictum [however] [if] a court . . . intentionally takes up, discusses, and decides a question *germane to*, though not necessarily decisive of, the controversy. . . . Rather, such action constitutes an act of the court [that] it will thereafter recognize as a binding decision." (Emphasis in original; internal quotation marks omitted.) *Healey* v. *Mantell*, 216 Conn. App. 514, 526, 285 A.3d 823 (2022). Our Supreme Court's statement in *Maietta* that "egregious, shocking or harassing police misconduct" would warrant the

exclusionary rule to be inapplicable, however, when the challenged search was organized under the auspices of probation, rather than the police. See, e.g., *State* v. *Moore*, 112 Conn. App. 569, 578, 963 A.2d 1019 (exclusionary rule was inapplicable in revocation of probation case where "primary search" of defendant's apartment was performed by probation officers, even though police were eventually present and arrested defendant), cert. denied, 291 Conn. 905, 967 A.2d 1221 (2009); *State* v. *Fuessenich*, 50 Conn. App. 187, 198, 717 A.2d 801 (1998) (court in revocation of probation case improperly applied exclusionary rule to suppress urinalysis results where probation officer, rather than police, required defendant to submit urine sample, as "[t]here was no police participation in requiring the defendant to submit to urinalysis, and the probation officer was acting in accordance with conditions to which the defendant had agreed"), cert. denied, 247 Conn. 956, 723 A.2d 813, cert. denied, 527 U.S. 1004, 119 S. Ct. 2339, 144 L. Ed. 2d 236 (1999). As this court explained in *Fuessenich*, "when a probation officer demands a probationer's compliance with a condition of probation, he or she is acting as a representative of the [J]udicial [B]ranch and not as a police officer. Applying the exclusionary rule to probation revocation hearings would make it more difficult for probation officers to perform

application of the exclusionary rule in a revocation of probation proceeding cannot fairly be characterized as mere passing commentary. (Internal quotation marks omitted.) *State* v. *Maietta*, supra, 320 Conn. 687. To the contrary, as we discuss herein, the court in *Maietta* analyzed whether the record supported the application of the exclusionary rule by considering whether it disclosed evidence of egregious, harassing or shocking police misconduct, reviewing the relevant factual findings, and concluding, on the basis of its review, that such evidence was wanting. See id., 687–88. "[T]here is nothing in [the] opinion . . . to suggest that [this] conclusion was less carefully reasoned than it might otherwise have been." *Rosenthal Law Firm, LLC* v. *Cohen*, 190 Conn. App. 284, 294, 210 A.3d 579 (2019). We therefore afford this statement from *Maietta* the weight it is due as binding precedent of our Supreme Court.

properly their job of helping to ensure the rehabilitation of offenders." Id., 199.

The most recent case in which our Supreme Court has discussed the applicability of the exclusionary rule in a revocation of probation proceeding is *State* v. *Maietta*, supra, 320 Conn. 678. In *Maietta*, the defendant's probation officer sought and received approval from his superiors to search the defendant's garage after receiving information indicating that the defendant was in possession of firearms. Id., 682–83. With the assistance of three other probation officers, two inspectors employed by the Office of the Chief State's Attorney, members of the Greater New Britain Shooting Task Force, and an officer with the Berlin Police Department (collectively, search team), the probation officer traveled to the defendant's apartment, encountered the defendant, and obtained the defendant's consent to search his garage. Id., 683–84. The defendant traveled with the search team to his garage and allowed the members of the search team inside. Id., 684. He identified a dresser in the garage as containing a firearm. Id. The probation officers opened the dresser and recovered a firearm. Id. The defendant was subsequently charged with violating the conditions of his probation and moved to suppress the firearm as well as his statements to his probation officer and other members of the search team. Id., 684–85. The trial court denied the motion to suppress, concluding in part that the exclusionary rule was inapplicable. Id., 685. The defendant was subsequently found to have violated the conditions of his probation, and he appealed, challenging, inter alia, the denial of his motion to suppress. Id.

On appeal, our Supreme Court concluded that the defendant had "offer[ed] no compelling reasons as to why the exclusionary rule should apply under the circumstances of his case." Id., 687. In particular, the court rejected the defendant's claim that the search of his

garage was a "thinly veiled law enforcement search orchestrated by the police." Id. The court explained that, according to the trial court's findings, the defendant's probation officer was acting in his capacity as a probation officer when he conducted the searches and questioned the defendant; and the searches were conducted by probation officers, not the law enforcement personnel who were present. Id. The court further concluded that "nothing in the underlying record indicates that [the probation officers] were conducting the searches at the behest of the police or for reasons other than to ensure that the defendant was in compliance with the terms of his probation." Id. The court also determined that there was no evidence of "egregious, shocking or harassing police misconduct" that would merit the application of the exclusionary rule, noting that the trial court had found "no evidence that the defendant was restrained in any way . . . [or] that force was used," "no evidence of overbearing conduct, [coercion] or duress of any kind," and that "[t]here was no pushing, arguing, or harassing the defendant." (Internal quotation marks omitted.) Id., 687–88. To the contrary, the court concluded, "the record show[ed] that the defendant voluntarily allowed [his probation officer] and his search team into his apartment and the garage and cooperated with the searches." Id., 688. The court accordingly concluded that the exclusionary rule was inapplicable. Id.

The circumstances of the present case cannot meaningfully be distinguished from those of *Maietta*. The trial court found—and the defendant does not contest—that, although the police were present for, and may have participated in,[7] the search, the search was initiated by and organized under the auspices of the Office of Adult Probation. This conclusion is well supported by the

---

[7] The precise extent of the police's involvement in the search is not clear from the record.

record. According to Betancourt's testimony, which the court credited, the decision to search the defendant's apartment was made during a meeting between Betancourt and his supervisor. Betancourt was also the person who secured the defendant's signature on the voluntary agreement to search form, and the form was signed in the presence of another probation officer. There is no indication from the record that Betancourt was acting in anything other than his capacity as a probation officer, or for any purpose other than to verify the defendant's compliance with the conditions of his probation, when he decided to search the defendant's residence and presented him with the consent form.

Moreover, as the court found, the record discloses no egregious, shocking or harassing police misconduct in connection with the search. Although the defendant claims that "[t]he sheer number of police officers is shocking and egregious under the circumstances," he has cited no authority for the proposition that the presence of an allegedly excessive number of officers during a search, without more, amounts to egregious police misconduct. There is a dearth of evidence to suggest that any of the officers used force against the defendant, harassed or argued with him, or engaged in any other unduly coercive behavior in connection with the search. As such, the defendant has not met his burden to show that the exclusionary rule should apply. We therefore need not and do not reach the merits of the defendant's arguments pertaining to the existence of reasonable suspicion, the validity of his consent, or the scope of the search.[8] Because the exclusionary rule does not

___

[8] In his reply brief, the defendant asserts these arguments as further justification for his claim that the exclusionary rule should apply. These arguments bear on whether suppression would be warranted in a context in which the exclusionary rule applied but not on whether the exclusionary rule should apply in the first instance. See, e.g., *State* v. *Maietta*, supra, 320 Conn. 688 n.2 (declining to consider defendant's arguments that he did not consent to search and that he was in custody for purposes of *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), in light of conclusion that exclusionary rule was inapplicable).

apply under the circumstances of the present case, the trial court did not err in denying the defendant's motion to suppress.

## II

The defendant next claims that there was insufficient evidence that he violated his probation. We disagree with this claim because, of the three grounds articulated by the court for finding the defendant in violation of his probation, two are supported by sufficient evidence. However, because the evidence does not support the court's conclusion that the defendant violated the condition of his probation requiring him to take a polygraph examination, and because we cannot be confident that the court's clearly erroneous factual finding in connection with this conclusion did not impact the sentence it imposed, we set aside the defendant's sentence and remand the matter for resentencing.

The following principles are relevant to our review of the defendant's claim. "The law governing the standard of proof for a violation of probation is well settled. . . . [A]ll that is required in a probation violation proceeding is enough to satisfy the court within its sound judicial discretion that the probationer has not met the terms of his probation." (Internal quotation marks omitted.) *State* v. *Eric L.*, 218 Conn. App. 302, 308, 291 A.3d 621 (2023), rev'd in part on other grounds, 350 Conn. 798, 326 A.3d 225 (2024). "[E]vidence is not insufficient [merely] because it is conflicting or inconsistent. [The fact finder] is free to juxtapose conflicting versions of events and determine which is more credible. . . . It is the [fact finder's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses. . . . The [fact finder] can . . . decide what—all, none, or some—of a witness' testimony to accept or reject. . . .

"A challenge to the sufficiency of the evidence is based on the court's factual findings. The proper standard of review is whether the court's findings were clearly erroneous based on the evidence. . . . A court's finding of fact is clearly erroneous and its conclusions drawn from that finding lack sufficient evidence when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . [A] trial court may not find a violation of probation unless it finds that the predicate facts underlying the violation have been established by a preponderance of the evidence at the hearing—that is, the evidence must induce a reasonable belief that it is more probable than not that the defendant has violated a condition of his or her probation. . . . In making its factual determination, the trial court is entitled to draw reasonable and logical inferences from the evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Santos*, 108 Conn. App. 250, 253–54, 947 A.2d 414 (2008). "This court has observed that to support a judgment of revocation of probation, [o]ur law does not require the state to prove that all conditions alleged were violated; it is sufficient to prove that one was violated." (Internal quotation marks omitted.) *State* v. *Wells*, 112 Conn. App. 147, 156, 962 A.2d 810 (2009).

As we previously have explained, the trial court found that the defendant had violated the conditions of his probation in three ways: (1) possessing sexually explicit materials, some of which involved children; (2) failing "to participate in the Office of Adult Probation order of polygraph and its equivalent, EyeDetect"; and (3) using computers that had not previously been approved by the Office of Adult Probation. The defendant challenges each finding. We conclude that there is sufficient

evidence to support the first and third findings, but not the second.[9]

A

With respect to the trial court's finding that the defendant possessed sexually explicit materials, the defendant argues that "there was insufficient evidence to connect [him] to the images in question" because "there was nothing presented at the violation of probation proceeding to indicate when the images were put on the device, when they were last accessed, or who accessed them." He further points out that, during the revocation of probation hearing, DiPietro acknowledged on cross-examination that the data reflecting when the materials recovered from the seized devices were created and accessed could be manipulated and that anyone with administrative rights could have created the folder labeled "sykesp" on the computer from which many of the images were recovered. We are not persuaded.

"The term [p]ossess [under General Statutes § 53a-3 (2)] means to have physical possession or otherwise to exercise dominion or control over tangible property . . . . [C]onstructive possession is possession without direct physical contact. . . . It can mean an appreciable ability to guide the destiny of the [contraband] . . . and contemplates a continuing relationship between the controlling entity and the object being controlled. . . . To establish constructive possession, the control must be exercised intentionally and with knowledge of the character of the controlled object." (Citations omitted; internal quotation marks omitted.) *State* v. *Dawson*, 340 Conn. 136, 147–48, 263 A.3d 779 (2021). "To mitigate the possibility that innocent persons might be prosecuted for . . . possessory offenses . . . it is essential that the state's evidence include more than

---

[9] In the following analysis, we address the grounds found by the court in a different order than that in which they were set forth in its oral ruling.

just a temporal and spatial nexus between the defendant and the contraband. . . . While mere presence is not enough to support an inference of dominion or control, where there are other pieces of evidence tying the defendant to dominion and control, the [finder of fact is] entitled to consider the fact of [the defendant's] presence and to draw inferences from that presence and the other circumstances linking [the defendant] to the crime." (Internal quotation marks omitted.) *State v. Spence*, 165 Conn. App. 110, 124, 138 A.3d 1048, cert. denied, 321 Conn. 927, 138 A.3d 287 (2016).

In the present case, there was sufficient evidence in the record to support the trial court's conclusion that the defendant possessed sexually explicit materials, some of which involved children. The devices containing those materials were recovered from a search of the defendant's residence. See, e.g., *State* v. *Smith*, 94 Conn. App. 188, 193, 891 A.2d 974 ("[o]ne factor that may be considered in determining whether a defendant is in constructive possession of narcotics is whether he is in possession of the premises where the narcotics are found" (internal quotation marks omitted)), cert. denied, 278 Conn. 906, 897 A.2d 100 (2006). The defendant also had signed a computer access agreement in which he assumed responsibility for the contents of any electronic storage medium under his control. Furthermore, suspected child pornography and child exploitation material was found on a seized laptop with a user account named "sykesp"—the defendant's last name and first initial. The seized devices also contained other materials linking them to the defendant, including receipts from the defendant's prior place of residence and medical documentation bearing the defendant's address. The court was entitled logically to infer, on the basis of all of this evidence, that the defendant was in possession of the offending materials, and the court was not required to credit the defendant's speculative

suggestions that someone else might have accessed those materials, put them on the device, and/or created a user account in his name. The defendant's challenge to the court's finding therefore fails.

B

With respect to the court's finding that the defendant utilized unapproved computers, the defendant claims that the evidence shows that he worked in the information technology field and that he was permitted to work on electronic devices from home for the purposes of employment. He further claims that there is no evidence that the seized devices were not devices that he was working on for his job. We are not persuaded.

The following additional procedural history is relevant to this claim. Betancourt testified in the revocation of probation hearing that, of the thirty-five devices that were seized from the defendant's residence, the defendant was approved by probation to possess only three. Betancourt's subsequent testimony explaining and elaborating on this conclusion, elicited through multiple rounds of recross and redirect examination as well as questioning by the court, was admittedly not a model of clarity. He acknowledged that the defendant worked in the information technology field. He testified at one point that, if the seized devices were for the purposes of the defendant's employment, "I believe [he would be permitted to possess them]. Yeah. It's—there probably should have been a list of different things, right, as far as those devices. We have no—at that point we had no—they were not authorized in our eyes." He then testified that, whether or not the seized devices were being used for the defendant's employment, they still had to be approved by the Office of Adult Probation, and he had no documentation or memory of the defendant ever having sought that approval. He then testified that, "based on the conditions," i.e., under the computer

access agreement, the Office of Adult Probation should have been provided with a list of the devices that the defendant was working on for his employment. He then testified that the defendant had previously provided a list of devices in his possession to another probation officer and that he "[didn't] believe" that any of the items on that list corresponded to items seized during the May 13, 2021 search, "but [he would] have to see the list again." He stated that he had not brought a copy of the list with him.

Notwithstanding the imprecision of this testimony, the court reasonably could have concluded that, even if the defendant generally was authorized to work on computers for purposes of employment, he nonetheless was required to seek approval from the Office of Adult Probation to use the specific devices on which he was working. See, e.g., *State* v. *Santos*, supra, 108 Conn. App. 253 (evidence is not insufficient merely because it is conflicting or inconsistent). The court further reasonably could have found, as Betancourt testified, that the vast majority of the devices seized from the defendant's residence had not been so approved. These conclusions are supported by evidence in the record, and we are not left with a definite and firm conviction that a mistake has been committed. The evidence was sufficient for the court to conclude that the defendant violated the condition of his probation requiring that he use only those computers approved by his probation officer.

C

Finally, the defendant claims that the evidence was insufficient to support the court's conclusion that he violated the condition of his probation requiring him to take polygraph examinations. We agree.

In concluding that the defendant had violated this condition, the court stated that the defendant had "failed to participate in the Office of Adult Probation

order of polygraph and its equivalent, EyeDetect." As the defendant correctly points out—and as Betancourt acknowledged in his testimony—the condition of probation requiring the defendant to take polygraph examinations did not require him to take a polygraph examination "[or] its equivalent, EyeDetect." It simply required him to take polygraph examinations. In finding that the defendant's refusal to take an EyeDetect examination violated this condition, the court therefore was required to conclude that an EyeDetect examination amounted to a type of polygraph examination and/or was sufficiently similar to a polygraph such that the condition requiring the defendant to take polygraph examinations afforded him fair notice that refusal to take an EyeDetect examination would violate that condition. See, e.g., *State* v. *Boseman*, 87 Conn. App. 9, 22–23, 863 A.2d 704 (2004) (assessing whether, in absence of modification of condition or new condition imposed by probation officer, probation condition imposed by court could reasonably be interpreted to prohibit defendant's behavior, in light of due process requirement of fair notice), cert. denied, 272 Conn. 923, 867 A.2d 838 (2005). Indeed, the court's description of EyeDetect as the "equivalent" of a polygraph examination indicates that it did make such a finding.[10]

---

[10] In finding the defendant in violation of probation, the court stated that the defendant had "failed to participate in the *Office of Adult Probation order* of polygraph and its equivalent, EyeDetect." (Emphasis added.) To the extent that the court concluded that compliance with the EyeDetect examination was a valid condition imposed on the defendant by the Office of Adult Probation pursuant to its authority under General Statutes § 53a-30 (b) to "require that the defendant comply with any or all conditions which the court could have imposed . . . which are not inconsistent with any condition actually imposed by the court," we disagree. There was no evidence before the court that Betancourt actually imposed such a condition on the defendant. See, e.g., *State* v. *Boseman*, supra, 87 Conn. App. 22 (where "the specific condition the court found the defendant to have violated could not be interpreted reasonably to prohibit his behavior, and [the defendant's probation officer] did not provide a written modification of that condition or a new condition, we conclude that the defendant was not afforded actual, fair and sufficient notice" that conduct would constitute violation). Betan-

The record, however, is devoid of evidence that would support such a conclusion. It is not at all clear from the record what an EyeDetect examination is, how it functions, or the extent to which it is similar to a, and/ or can be classified as a type of, polygraph examination. Betancourt testified that The Connection was using EyeDetect examinations in place of polygraph examinations in light of the COVID-19 pandemic but characterized an EyeDetect examination and a polygraph examination as "two different things." Neither Betancourt's nor DiPietro's testimony elaborated any further on the nature of an EyeDetect examination. Nor does the state, in its brief, direct our attention to anything else in the record that would shed light on this critical factual question.[11] Of course, because this court is not a fact-finding tribunal, in conducting our sufficiency analysis we may not draw our own conclusions, on the basis

court testified that he and the defendant had a conversation regarding the defendant's refusal to take the EyeDetect examination but did not testify that he issued the defendant any clear warnings that his refusal could constitute a violation of his conditions of probation. Cf. *State* v. *Reilly*, 60 Conn. App. 716, 732–33, 760 A.2d 1001 (2000) ("[i]n revocation hearings where the alleged violative behavior is noncriminal, we hold that where the specific condition did not explicitly proscribe the defendant's conduct and could not be reasonably interpreted to proscribe the defendant's conduct, the defendant must receive actual notice that the continuation of the conduct could result in a charge of a violation of a condition of probation"). The record does reflect that *The Connection* issued the defendant a warning letter following his refusal to take the EyeDetect examination, but the state identifies no authority, and we are aware of none, that would permit a third-party treatment provider—rather than the court or the Office of Adult Probation—unilaterally to modify a defendant's conditions of probation. Moreover, as discussed further herein, we emphasize that the arrest warrant did not allege that the defendant violated a condition of his probation on the basis of his failure to comply with treatment.

[11] We note that the polygraph condition also required that the defendant's polygraph examinations be administered by a "[Court Support Services Division] approved, specially trained" examiner. There is no evidence in the record regarding the qualifications of the individual responsible for administering the EyeDetect examination to the defendant or indicating whether that individual had been approved to do so by the Court Support Services Division.

of extrarecord evidence, about the similarities and/or differences between an EyeDetect examination and a polygraph examination. See, e.g., *Williams* v. *Commissioner of Correction*, 177 Conn. App. 321, 331–32, 175 A.3d 565 ("[I]t is not the function of this court . . . to make factual findings . . . . Conclusions of fact may be drawn on appeal only where the subordinate facts found [by the trial court] make such a conclusion inevitable as a matter of law . . . or where the undisputed facts or uncontroverted evidence and testimony in the record make the factual conclusion so obvious as to be inherent in the trial court's decision." (Emphasis omitted; internal quotation marks omitted.), cert. denied, 327 Conn. 990, 175 A.3d 563 (2017). We therefore conclude that the court's factual finding that an EyeDetect examination was the "equivalent" of a polygraph examination—a finding necessary to its determination that the defendant violated the condition of his probation requiring him to take polygraph examinations— was clearly erroneous because there was no evidence in the record to support it.

The state attempts to circumvent this evidentiary deficiency by arguing that the defendant's conditions of probation also required him to submit to any and all conditions of his sex offender treatment, as well as to medical and/or psychological examinations and/or counseling sessions, and that compliance with these conditions required submitting to the EyeDetect examination—which was administered by the defendant's sex offender treatment provider. Betancourt's application for an arrest warrant, however, did not allege a violation of probation based on the defendant's failure to comply with the conditions of his probation requiring sex offender treatment, counseling, and/or medical or psychological examinations. Due process requires that the defendant have notice of the conditions of probation that he is alleged to have violated. See, e.g., *State* v.

*Orr*, 199 Conn. App. 427, 450–51, 237 A.3d 15 (2020) (disregarding court's findings, in revocation of probation case, that defendant had violated criminal statutes that were not enumerated in arrest warrant application); *State* v. *Carey*, 30 Conn. App. 346, 349, 620 A.2d 201 (1993) ("a defendant cannot be found in violation of probation on grounds other than those with which he is charged"), rev'd on other grounds, 228 Conn. 487, 636 A.2d 840 (1994). We therefore reject the state's argument.

In sum, because a key factual finding underpinning the court's determination that the defendant violated the condition of his probation requiring him to take polygraph examinations—namely, that an EyeDetect examination is the "equivalent" of a polygraph examination—is not supported by the record, there was insufficient evidence that the defendant violated this condition of his probation.

D

We now turn to the scope of our remand. There was sufficient evidence from which the court reasonably could have concluded that the defendant violated two of the three conditions of his probation that it found him to have violated, and, therefore, there was sufficient evidence that the defendant violated the conditions of his probation. See, e.g., *State* v. *Lanagan*, 119 Conn. App. 53, 62, 986 A.2d 1113 (2010); *State* v. *Wells*, supra, 112 Conn. App. 156. We conclude, however, that, under the circumstances of this case, because there was insufficient evidence to support the court's conclusion that the defendant violated his polygraph condition, the appropriate course is to set aside the defendant's sentence and remand for resentencing.

We are guided by our Supreme Court's decision in *State* v. *Benjamin*, 299 Conn. 223, 9 A.3d 338 (2010). In *Benjamin*, our Supreme Court considered the appeal

of a defendant who had been found in violation of his probation on two grounds: that he had assaulted an elderly person and that he had possessed narcotics. Id., 225. On appeal to this court, the defendant did not challenge the latter finding but argued that the former was predicated on improperly admitted and otherwise insufficient evidence; he further claimed that the trial court had abused its discretion by imposing a four year term of incarceration that was based, in part, on its conclusion that he had assaulted an elderly person. Id., 226. This court concluded that it was unnecessary to review the defendant's challenges to the trial court's finding that he had assaulted an elderly person because the trial court's unchallenged finding that the defendant had possessed narcotics constituted a legally sufficient basis for revoking his probation. Id. Our Supreme Court disagreed. The court explained that this court had "failed to recognize that the defendant's briefing . . . also addressed the *dispositional* phase of the probation proceeding. . . . Presumably, in the dispositional phase, the question of whether, in addition to possessing narcotics, the defendant also had committed the assault would have had some bearing on which disposition the court ordered and, if the court ordered the defendant to serve some portion of his suspended sentence as to that disposition, what that sentence would be." (Citation omitted; emphasis in original; footnote omitted.) Id., 231–32. The court went on to conclude that there had been sufficient evidence that the defendant was guilty of assaulting an elderly person, noting that that determination "obviate[d] the need for this court to direct the Appellate Court to remand the case to the trial court for a new dispositional phase . . . to consider whether the sentence based solely on the defendant's possession of narcotics was appropriate or whether to reduce the sentence in the absence of sufficient evidence of assault." Id., 234 n.6.

In the present case, the record indicates that the court's dispositional determination *may* have been impacted by its conclusion that the defendant had violated his polygraph condition. In particular, the court's comments that the defendant had been "researching" *United States* v. *Johnson*, supra, 446 F.3d 272, in a possible attempt to "[build] a defense" for refusing to take the EyeDetect examination, suggest that it may have viewed the defendant's refusal to "take a polygraph examination [or] its equivalent" as bad faith misconduct warranting the imposition of a more severe sentence than he might otherwise have received. At the very least, we cannot be confident that the court would not have exercised its discretion differently in the dispositional phase had it sentenced the defendant only on the basis of the two grounds for finding the defendant in violation of his probation that were sufficiently supported by the record. See also, e.g., *State* v. *Johnson*, 75 Conn. App. 643, 660, 817 A.2d 708 (2003) (remanding revocation of probation case for resentencing where trial court, in imposing sentence, considered defendant's refusal to sign forms that he was under no obligation to sign, and explaining that "we have no way of determining whether the court, in exercising its discretion, would have imposed the same sentence if . . . [the forms] were not an issue in the proceeding").

We therefore conclude that a remand for resentencing is appropriate in light of our conclusion that the evidence was insufficient to support the court's finding that the defendant violated the condition of his probation requiring him to take polygraph examinations. In remanding the matter for resentencing, we express no view as to the appropriate sentence, and we commit that determination to the sound discretion of the trial court. See, e.g., *Miller* v. *Commissioner of Correction*, 29 Conn. App. 773, 780, 617 A.2d 933 (1992) ("[t]he imposition of an appropriate sentence is the function

of the trial court, and not our function"). On remand, the court may, "[o]n the basis of its consideration of the whole record . . . continue or revoke the sentence of probation . . . [and] . . . require the defendant to serve the sentence imposed or impose any lesser sentence. . . . In making this second determination, the trial court is vested with broad discretion. . . . In determining whether to revoke probation, the trial court shall consider the beneficial purposes of probation, namely rehabilitation of the offender and the protection of society. . . . The important interests in the probationer's liberty and rehabilitation must be balanced, however, against the need to protect the public." (Internal quotation marks omitted.) *State* v. *Mapp*, 118 Conn. App. 470, 478, 984 A.2d 108 (2009), cert. denied, 295 Conn. 903, 988 A.2d 879 (2010).

The judgment is reversed only as to the sentence imposed and the case is remanded with direction to resentence the defendant; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.